

# Exhibit 2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

| | |
|---|---|
| The Estate of JOSEPHINE DECICCO, by her Proposed Administrator, GRACE DECICCO,<br><br>　　　　　　　　　　　Plaintiff(s),<br><br>　-against-<br><br>GWC-MILL BASIN, INC. and SUNRISE AT MILL BASIN,<br><br>　　　　　　　　　　　Defendant(s), | **SUMMONS**<br><br>Index No.:<br>Date Purchased:<br><br>Plaintiff designates Kings County as the place of trial<br><br>The basis of venue is Defendant's address:<br>5905 Strickland Ave<br>Brooklyn, NY 11234 |

To the above-named Defendant(s):

**YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's attorney within 20 days after the service of this Summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated: Melville, New York
　　　　November 2, 2022

　　　　　　　　　　　　　　**LEITNER VARUGHESE WARYWODA PLLC**
　　　　　　　　　　　　　　*Attorneys for Plaintiff*

　　　　　　　　　　　　　　By: _____
　　　　　　　　　　　　　　**Justin Varughese, Esq.**
　　　　　　　　　　　　　　425 Broadhollow Road, Suite 417
　　　　　　　　　　　　　　Melville, New York 11747

Defendants' Address(es):

**GWC-MILL BASIN, INC.,** 5905 STRICKLAND AVE, BROOKLYN, NY 11234.

**SUNRISE AT MILL BASIN,** 5905 STRICKLAND AVE, BROOKLYN, NY 11234

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

| | |
|---|---|
| The Estate of JOSEPHINE DECICCO, by her Proposed Administrator, GRACE DECICCO, <br><br>                                Plaintiff(s), <br><br>   -against- <br><br> GWC-MILL BASIN, INC.; and SUNRISE AT MILL BASIN, <br><br>                           Defendant(s), | **Index No:** <br><br> **VERIFIED COMPLAINT** <br><br> Plaintiff demands a Jury Trial |

Plaintiff, by their attorneys, LEITNER VARUGHESE WARYWODA PLLC, complaining of the defendants, respectfully alleges upon information and belief:

## I.     THE PARTIES

### a. Plaintiff

1. That at all times hereinafter mentioned, plaintiff GRACE DECICCO, is the child of the decedent, JOSEPHINE DECICCO, and is a resident of the State of NY, County of Nassau.

2. That at all times hereinafter mentioned, plaintiff's decedent, JOSEPHINE DECICCO, was a resident of the County of Kings, State of New York.

3. That on April 10, 2020, plaintiff's decedent, JOSEPHINE DECICCO, died within the State of New York.

4. That at all times hereinafter mentioned, JOSEPHINE DECICCO and her next of kin are represented in this action by GRACE DECICCO, as Proposed Administrator of the Estate.

5. This action falls within one or more exceptions as set forth in N.Y. Civil Practice Laws and Rules ("C.P.L.R.") Article 16.

6. According to the New York Department of Health, defendant GWC-MILL BASIN, INC. is the owner and operator of SUNRISE AT MILL BASIN, which is located at 5905 Strickland Ave, Brooklyn, NY 11234.

7. That at all times relevant hereto, the term "residential health care" shall refer to and include defendants GWC-MILL BASIN, INC. d/b/a SUNRISE AT MILL BASIN, the owner(s) and operator(s) of same, as well as any agents, representatives, employees, care givers, nurses, directors, doctors, physician's assistants, or staff members of said facility or corporations.

8. Defendant GWC-MILL BASIN, INC. is located at 5905 Strickland Ave, Brooklyn, NY 11234.

9. That at all times hereinafter mentioned, upon information and belief, defendant GWC-MILL BASIN, INC. was and still is a domestic corporation, duly organized under and existing by virtue of the laws of the State of New York.

10. That at all times hereinafter mentioned, upon information and belief, the defendant, GWC-MILL BASIN, INC., was and still is a business entity doing business within the State of New York.

11. That at all times hereinafter mentioned, upon information and belief, defendant GWC-MILL BASIN, INC. maintained its principal place of business in the County of Kings, State of New York.

12. Prior to and at all times hereinafter mentioned, defendant GWC-MILL BASIN, INC. was authorized to do business and to operate as a residential health care facility at 5905 Strickland Ave, Brooklyn, NY 11234, County of Kings, State of New York, known as Sunrise at Mill Basin.

13.     Prior to and at all times hereinafter mentioned, defendant GWC-MILL BASIN, INC. was and is the owner of a certain residential health care facility located at 5905 Strickland Ave, Brooklyn, NY 11234, County of KINGS, State of New York, known as GWC-MILL BASIN, INC..

14.     That at all times hereinafter mentioned, upon information and belief, defendant GWC-MILL BASIN, INC. was the lessor of the aforesaid residential health care facility.

15.     That at all times hereinafter mentioned, upon information and belief, defendant GWC-MILL BASIN, INC. was the lessee of the aforesaid residential health care facility.

16.     That at all times hereinafter mentioned, upon information and belief, defendant GWC-MILL BASIN, INC. maintained, managed, operated, controlled, supervised, and inspected the aforesaid residential health care facility.

17.     Prior to and at all times hereinafter mentioned, defendant GWC-MILL BASIN, INC. had possession and control of the building and facilities where the aforesaid residential health care facility is located.

18.     That at all times relevant hereto, upon information and belief, defendant GWC-MILL BASIN, INC. owned the premises and appurtenances and fixtures thereto, located at 5905 Strickland Ave, Brooklyn, NY 11234, County of Kings, State of New York.

19.     Prior to and at all times hereinafter mentioned, the defendant, GWC-MILL BASIN, INC., was and still remains engaged in conducting and operating a residential health care facility known as SUNRISE AT MILL BASIN, located at 5905 STRICKLAND AVE, BROOKLYN, NY 11234, County of KINGS, State of New York, and holds itself out to the general public as a facility providing such care and accommodations where patients can be treated by competent and skilled physicians and nursing staff to care for those who are ill.

20.     Prior to and at all times hereinafter mentioned, the defendant, GWC-MILL BASIN, INC., was and still remains engaged in conducting and operating a residential health care facility for health-related care and services known as GWC-MILL BASIN, INC., located at 5905 Strickland Ave, Brooklyn, NY 11234, County of Kings , State of New York, and holds itself out to the general public as a facility providing such care and accommodations where patients can be treated by competent and skilled physicians and nursing staff to care for those who are ill.

21.     Prior to and at all times hereinafter mentioned, the defendant, GWC-MILL BASIN, INC., was and still remains engaged in conducting and operating a residential health care facility for the rehabilitation care of ill and injured persons known as SUNRISE AT MILL BASIN, located at 5905 STRICKLAND AVE, BROOKLYN, NY 11234, County of KINGS, State of New York, and holds itself out to the general public as a facility providing lodging, board and physical care including the recording of health information, dietary supervision.

22.     That at all times relevant hereto, defendant GWC-MILL BASIN, INC. claimed to provide for the proper care and safety of the residents at their residential health care facility, claimed to provide personnel, including doctors, nurses, attendants, assistance and others for the proper, safety and good treatment of its patients and residents, and held itself out to the general public as furnishing treatment facilities where patients and residents, including plaintiff's decedent, JOSEPHINE DECICCO, could be provided with proper care and safety.

23.     That at all times hereinafter mentioned, defendant GWC-MILL BASIN, INC. represented that its residential health care, located at 5905 STRICKLAND AVE, BROOKLYN, NY 11234, County of KINGS, State of New York, was competent to perform and render all the resident care, medical care, treatment, services and advice required by plaintiff's decedent, JOSEPHINE DECICCO.

24.     That at all times hereinafter mentioned, defendant GWC-MILL BASIN, INC. was a facility providing therein housing, 24-hour on site monitoring, personal care services, and/or home care services, case management services, and an individualized service plan pursuant to New York Public Health Law §4662, §4657, §4659 and New York Compilation of Code Rules and Regulations Chapter 10, Part 1001.

25.     That at all times relevant hereto, defendant GWC-MILL BASIN, INC. was operating a residential health care in the State of New York within the meaning of Article 28 of the Public Health Law and at all times relevant hereto, defendant was under a duty to comply with all duties set forth in that chapter.

26.     That at all times relevant hereto, defendant GWC-MILL BASIN, INC. was an assisted living residence as defined in New York Public Health Law §4662, §4657, §4659 and 10 NYCRR 1001.

27.     That at all times relevant hereto, residential health care facilities in the State of New York must comply with all pertinent Federal, State and local laws, regulations, codes, standards and principals, pursuant to the New York Code, Rules and Regulations (NYCRR), 10 NYCRR 415.1 (b)(4).

28.     That at all times relevant hereto, residential health care facilities in the State of New York are required to provide care and services in a manner and quality consistent with generally accepted standards of practice pursuant to 10 NYCRR 415.1(b)(1).

29.     That at all times relevant hereto, the residential health care of defendant GWC-MILL BASIN, INC. was and still is a participant in Medicare and Medicaid.

30.     That at all times hereinafter mentioned, to participate in Medicare and Medicaid programs, the residential health care facility of defendant GWC-MILL BASIN, INC. was required

to be in compliance with the Federal requirements for long-term care as prescribed in the U.S. Code of Federal Regulations, 42 C.F.R. §483.

31.     That at all times hereinafter mentioned, to participate in Medicare and Medicaid programs, the residential health care facility of defendant GWC-MILL BASIN, INC. was and still is aware that it is required to be in compliance with the Federal requirements for long-term care as prescribed in the U.S. Code of Federal Regulations, 42 C.F.R. §483.

32.     That under the Code of Federal Regulations, the residential health care facility of defendant GWC-MILL BASIN, INC., must:

> a. have sufficient nursing staff to provide nursing and related services to attain and maintain the highest practicable physical, mental, and psycho- social well-being of each resident (42 C.F.R. §483.30); and,
>
> b. provide, if a resident is unable to carry out activities of daily living, the necessary services to maintain good nutrition, grooming, and personal and oral hygiene (42 C.F.R. §483.25); and,
>
> c. ensure that the resident's environment remains free of accident hazards (42 C.F.R. §483.25(h)(1)); and,
>
> d. ensure that each resident receives adequate supervision and assistance devices to prevent accidents (42 C.F.R. §483.25(h)(2)); and,
>
> e. ensure that a resident maintains acceptable parameters of nutritional status such as body weight and protein levels (42 C.F.R. §483.25); and,
>
> f. provide an appropriate assessment of each resident entering a certified residential health care facility and the development and implementation of an appropriate care plan so that each resident is allowed to attain and maintain the highest practicable mental, physical and psycho-social well-being (42 C.F.R. §483.1); and,
>
> g. ensure that the facility protects the resident from unnecessary falls and accidents (42 C.F.R. §483.25(h)); and,

h. conduct an initial assessment to determine the resident's risks of falling and develop a care plan that is tailored to address the resident's needs (42 C.F.R. §483.20); and,

i. report any resident falls to the attending physician and also to the responsible party for the resident and to monitor the resident's complications from the fall; and,

j. the residential health care facility further has an obligation to investigate the cause of all falls and develop a plan to protect
the resident from future falls (42 C.F.R. §483.10(10)); and

k. conduct initially (no later than 14 days after admission) and periodically (after a significant change in the resident's physical or mental condition and in no case, less often than once every 12 months) a comprehensive, accurate, standardized, reproducible assessment of each resident's functional capacity (42 C.F.R. §483.20); and,

l. develop a comprehensive care plan for each resident that includes measurable objectives and timetables to meet a resident's medical, nursing, and mental and psycho-social needs that are identified in the comprehensive assessment. The care plan must be developed within 7 days after completion of the comprehensive assessment and describe the services that are to be furnished. Also, the care plan must be periodically reviewed and revised by a team of qualified persons after each assessment (42 C.F.R. §483.20); and,

m. prevent the deterioration of a resident's ability to bathe, dress, groom, transfer and ambulate, toilet, eat, and to use speech, language or other functional communication systems (42 C.F.R. §483.25); and,

n. ensure that residents receive proper treatment and assistive devices to maintain vision and hearing abilities (42 C.F.R. §483.25); and,

o. ensure that residents do not develop [pressure sores and, if a resident has pressure sores, must provide the necessary treatment and services to promote healing (42 C.F.R. §483.25); and,

p. provide appropriate treatment and services to incontinent

residents to restore as much normal bladder functioning as possible and prevent injury tract infections (42 C.F.R. §483.25); and,

q. provide each resident with sufficient fluid intake to maintain proper hydration and health (42 C.F.R. §483.25); and,

r. ensure that residents are free of any significant medication errors (42 C.F.R. §483.25); and,

s. care for its residents in a manner and in an environment that promotes maintenance or enhancement of each resident's quality of life (42 C.F.R. §483.15); and,

t. promote care for residents in a manner and in an environment that maintains or enhances each resident's dignity and respect in full recognition of his or her individuality (42 C.F.R. §483.15); and,

u. ensure that the resident has the right to chose activities schedules, and health care consistent with his or her interests, assessments, and plan of care (42 C.F.R. §483.15); and,

v. ensure that the medical care of each resident is supervised by a physician and must provide or arrange for the provision of physician services 24 hours per day, in case of an emergency (42 C.F.R. §483.40); and,

w. provide pharmaceutical services (including procedures that assure the accurate acquiring, receiving, dispensing, and administering of all drugs and biologicals) to meet the needs of each resident (42 C.F.R. §483.75); and,

x. be administered in a manner that enables it to use its resources effectively and efficiently to attain or maintain the highest practicable physical, mental and psychosocial well-being of each resident (42 C.F.R. §483.75); and,

y. maintain clinical records on each resident in accordance with accepted professional standards and practices that are complete, accurately documented, readily accessible, and systematically organized (42 C.F.R. §483.75).

33.     That at all times relevant hereto, defendant GWC-MILL BASIN, INC. had the duty to properly complete a comprehensive assessment for plaintiff's decedent JOSEPHINE DECICCO

34.     That at all times relevant hereto, defendant GWC-MILL BASIN, INC. had the duty to update a comprehensive assessment for plaintiff's decedent JOSEPHINE DECICCO and to keep it current.

35.     That at all times relevant hereto, defendant GWC-MILL BASIN, INC. had the duty to properly complete a comprehensive care plan for plaintiff's decedent JOSEPHINE DECICCO

36.     That at all times relevant hereto, defendant GWC-MILL BASIN, INC. had the duty to update a comprehensive care plan for plaintiff's decedent JOSEPHINE DECICCO and to keep it current.

37.     That at all times relevant hereto, defendant GWC-MILL BASIN, INC., by its officers, employees, agents and/or servants, under OBRA 42 C.F.R. §483.25 and New York State rules and regulations, had the duty to ensure that each resident must receive and the facility must provide the necessary care and services to attain or maintain the highest practicable physical, mental and psycho-social well-being, in accordance with the comprehensive assessment and care plan.

38.     Prior to and at all times relevant hereto, defendant GWC-MILL BASIN, INC. conducted business as a residential health care facility located at 5905 STRICKLAND AVE, BROOKLYN, NY 11234, County of KINGS, State of New York, as licensed and defined under New York Public Health Law Section 2801(2).

39.     Prior to and at all times relevant hereto, defendant GWC-MILL BASIN, INC. conducted business as a residential health care facility located at 5905 STRICKLAND AVE,

BROOKLYN, NY 11234, County of KINGS, State of New York, as licensed and defined under New York Public Health Law Section 2801(3).

40.     Prior to and at all times hereinafter mentioned, the defendant, GWC-MILL BASIN, INC., conducted business as an adult care facility located at 5905 STRICKLAND AVE, BROOKLYN, NY 11234, County of KINGS, State of New York, as licensed and defined under New York Public Health Law Section 2801(2).

41.     That at all times hereinafter mentioned, defendant GWC-MILL BASIN, INC. was subject to the provisions of New York Public Health Law Section 2801-c.

42.     Prior to and at all times hereinafter mentioned, defendant GWC-MILL BASIN, INC. was a residential health care facility providing therein health-related care and services to sick, invalid, infirm, disabled or convalescent persons in addition to lodging and board or health related services pursuant to New York Public Health Law Section 2801(2).

43.     Prior to and at all times hereinafter mentioned, defendant GWC-MILL BASIN, INC. is a residential health care facility as within the meaning of Public Health Law Section 2801(2).

44.     Prior to and at all times hereinafter mentioned, defendant GWC-MILL BASIN, INC. is a residential health care facility within the meaning of Public Health Law Section 2801(3).

45.     Prior to and at all times relevant hereto, defendant GWC-MILL BASIN, INC. was a facility subject to the provisions of New York Public Health Law Section 2801-d.

46.     Prior to and at all times hereinafter mentioned, defendant GWC-MILL BASIN, INC. was a facility subject to the provisions of New York Public Health Law Section 2803-c.

47.     Prior to and at all times hereinafter mentioned, defendant GWC-MILL BASIN, INC. was a facility subject to the provisions of Public Health Law Section 42 U.S.C. Section 1395(i) et seq.

48.     Prior to and at all times hereinafter mentioned, defendant GWC-MILL BASIN, INC. was a facility subject to the provisions of Public Health Law Section 1396(r) (1990) et seq. as amended by the Omnibus Budget Reconciliation Act of 1987 (OBRA Regulations).

49.     Prior to and at all times hereinafter mentioned, defendant GWC-MILL BASIN, INC. was a facility subject to the provisions of Public Health Law Section 42 Code of Federal Regulations Parts 483, setting Medicare and Medicaid Requirements for long term facilities ("OBRA" regulations) as effective October 1, 1990.

50.     Prior to and at all times hereinafter mentioned, the residential health care facility operated by defendant GWC-MILL BASIN, INC. was a "nursing facility" as defined by 42 U.S.C.A. Section 1396(r).

51.     Prior to and at all times hereinafter mentioned, defendant GWC-MILL BASIN, INC. is a licensed residential health care facility as such term is understood in law.

52.     Prior to and at all times hereinafter mentioned, defendant GWC-MILL BASIN, INC. is a residential health care facility certified for participation in the Medicare and Medicaid program as an intermediate skilled care facility.

53.     Prior to and at all times hereinafter mentioned, by reason of selection to participate as a long-term care provider, defendant GWC-MILL BASIN, INC. was able to enjoy substantial revenues paid for by tax fare funded government programs.

54.     Prior to and at all times hereinafter mentioned, the aforementioned government programs provided defendant GWC-MILL BASIN, INC. with a guaranteed source of income and

a continual flow of residents whose care was paid for by the Medicare and Medicaid program or some other taxpayer funded program.

55.     Prior to and at all times hereinafter mentioned, plaintiff-decedent, was the type of resident whose care was paid for by the government and was the type of resident defendant GWC-MILL BASIN, INC. actively sought in order to fill their empty beds, increase their rate of occupancy, and overall revenues.

56.     At all times relevant to this Complaint, defendant GWC-MILL BASIN, INC. was a proprietary corporation engaged in the for-profit operation of a residential health care facility, which claimed to "specialize" in the care of helpless individuals who are chronically infirm, mentally dysfunctional and/or in need of health-related care and services and treatment.

57.     Prior to and at all times hereinafter mentioned, in an effort to ensure that the plaintiff-decedent and other patients whose care was funded by the government were placed at their residential health care facility, defendant GWC-MILL BASIN, INC. held itself out to the New York Department of Health, the New York Department of Social Services and the public at large as being skilled in the performance of nursing, and other medical support services.

58.     Prior to and at all times hereinafter mentioned, in an effort to ensure that the plaintiff-decedent and other patients whose care was funded by the government were placed at their residential health care facility, defendant GWC-MILL BASIN, INC. held itself out to the New York Department of Health, the New York Department of Social Services and the public at large as being properly staffed, supervised and equipped to meet the total needs of their residential health care facility residents.

59.     Prior to and at all times hereinafter mentioned, in an effort to ensure that the plaintiff-decedent and other patients whose care was funded by the government were placed at

their residential health care facility, defendant GWC-MILL BASIN, INC. held itself out to the New York Department of Health, the New York Department of Social Services, and the public at large as being able to specifically meet the total nursing, medical and physical therapy needs of plaintiff's decedent and other residents like her.

60.     Prior to and at all times hereinafter mentioned, defendant GWC-MILL BASIN, INC., its principals, supervisors, agents, officers, employees, independent medical personnel, independent contractors, and/or Administrator; Assistant Administrator; Director of Nursing; Assistant Director of Nursing; Medical Director; Assistant Medical Director, or any or all of its corporate defendant stockholders, employees, independent medical personnel and/or independent contractors, or those of its residential health care facility, and all staff and personnel affiliated with defendant, were all well aware of the medical conditions and the care that plaintiff's decedent required, represented that they could adequately care for her needs, and persuaded the plaintiff's decedent and decedent's family to that effect.

61.     That at all times relevant hereto, plaintiff's decedent, JOSEPHINE DECICCO, was a resident at defendant's facility located at 5905 STRICKLAND AVE, BROOKLYN, NY 11234, County of KINGS, State of New York, and was under the care and management of defendant GWC-MILL BASIN, INC..

62.     That at all times relevant hereto, defendant GWC-MILL BASIN, INC. stood in such a relationship with plaintiff's decedent JOSEPHINE DECICCO, as to make it liable for the acts and omissions of its doctors, nurses, staff and employees.

## STATEMENT OF FACTS COMMON TO ALL CAUSES OF ACTION

63.     On December 31, 2019, the World Health Organization (herein after referred to as "WHO") China Country Office was informed of dozens of cases of pneumonia of unknown etiology detected in Wuhan City, Hubei Province of China.

64.     In or around January 2020, Defendants were made aware of severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2) spreading world-wide and nationally, known colloquially as the coronavirus, that caused severe medical distress and death in individuals who caught the disease, especially, the elderly.

65.     On January 7, 2020, the viral outbreak in Wuhan, China was identified as a new type/strain of coronavirus, 2019-nCoV (hereinafter referred to as "novel coronavirus").

66.     SARS-CoV-2 is known and documented to cause a debilitating and deadly disease, the Coronavirus disease 2019(hereinafter, "COVID-19").

67.     On January 11, 2020, Chinese state media reported its first known death from the novel coronavirus.

68.     On January 12, 2020, China shared the genetic sequence of the novel coronavirus for countries to use in developing specific diagnostic kits.

69.     On January 20, 2020, Japan, South Korea and Thailand reported their first confirmed cases of the novel coronavirus. On that same day, the head of a Chinese government coronavirus team confirmed that the novel coronavirus outbreak was transmitted by human-to-human contact, which was a development that put medical facilities, institutions, and long-term skilled nursing facilities on notice of the possibility that the novel corona virus could spread quickly and widely.

70.     On January 23, 2020, the United States and WHO confirmed its first case of the novel coronavirus in the State of Washington.

71.     On February 11, 2020, the WHO announced "COVID-19" as the shortened name of the novel "coronavirus disease 2019".

72.     On February 13, 2020, the U.S. Director of The Centers for Disease Control and Prevention (hereinafter referred to as "CDC") announced that COVID-19 will likely become a community virus and remain beyond this current season.

73.     On February 25, 2020, the CDC issued a warning that spread of the virus to the United States is likely and that people should prepare; and U.S. senators receive a classified briefing on the Trump administration's coronavirus response.

74.     COVID-19 can and has spread rapidly in long-term residential care facilities and persons with chronic underlying medical conditions are at greater risk for COVID-19.

75.     On February 28, 2020, a case of the novel coronavirus disease was identified and confirmed in a woman resident of a long-term care skilled nursing facility in King County, Washington. A subsequent epidemiologic investigation identified 129 cases of COVID-19, including 81 residents (over 62% of the resident population), 34 staff members, and 14 visitors. [1]

76.     These residents and/or patients there were the first in the nation to suffer from and die as a result of the COVID-19 virus, and news of the dire situation and the first deaths in the United States at the Life Care Center in Kirkland, Washington was widespread all throughout the United States and was known to all residential health care facility facilities.

77.     On February 29, 2020, the United States instituted "do not travel warnings" for affected areas including Italy and South Korea.

---

[1] https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e1.htm

78. On February 29, 2020, the CDC posted "Healthcare Facilities: Preparing for Community Transmission" with the following specific instructions to residential health care facility facilities:

- Limit visitors to the facility.
- Post visual alerts (signs, posters) at entrances and in strategic places providing instruction on hand hygiene, respiratory hygiene, and cough etiquette.
- Ensure supplies are available (tissues, waste receptacles, alcohol-based hand sanitizer).
- Take steps to prevent known or suspected COVID-19 patients from exposing other patients.
- Limit the movement of COVID-19 patients (e.g. keep them in their rooms)
- Identify dedicated staff to care for COVID-19 patients.
- Observe newly arriving patients/residents for development of respiratory symptoms.

79. On March 1, 2020, the first confirmed COVID-19 case in the State of New York was reported.

80. On March 3, 2020, the first presumed COVID-19-related death occurred at a residential health care facility in the State of New York.

81. On March 3, 2020, the WHO reported more than 90,000 infections of COVID-19 globally and about 3,000 deaths.

82. On March 4, 2020, the Centers for Medicare and Medicaid Services ("CMS") issued its *Guidance for Infection Control and Prevention of Coronavirus Disease 2019 (COVID-19) in Residential health care facility facilities*, recommending suspension and limitation of standard residential health care facility activities, and the screening of visitors and staff at residential health care facility facilities for signs and symptoms of a respiratory infection, such as fever, cough, and sore throat.

83. Other CMS recommendations included: increasing the availability and accessibility of alcohol-based hand sanitizers, tissues, no touch receptacles for disposal, and facemasks at the

facility's entrances, waiting rooms, patient check-ins, etc.; increasing signage for vigilant infection prevention, such as hand hygiene and cough etiquette; properly cleaning, disinfecting, and limiting sharing of medical equipment between residents and areas of the facility; and providing additional work supplies to avoid sharing among staff and residents (i.e., pens, pads), and properly disinfecting workplace areas (such as nurses' stations, phones, internal radios, etc.).

84.     On March 6, 2020, the NYSDOH issued guidance DAL NH-20-04, addressed to residential health care facility facilities, regarding the precautions and procedures these facilities should take to protect and maintain the health and safety of their residents and staff during the COVID-19 pandemic outbreak, and recognizing the "potential for more serious illness among older adults" and the "risk of outbreak" in these facilities  This NYSDOH guidance  recommended screening visitors, residential health care facility staff, and employees for symptoms of illness upon arriving at work, such as fever, lower respiratory infection, shortness of breath, cough, nasal congestion, runny nose, sore throat, nausea, vomiting, and/or diarrhea, adding that "residential health care facility facilities strictly enforce their illness and sick leave policies".

85.     The next day, on March 7, 2020, the then Governor of New York, Andrew M. Cuomo, declared a state of emergency over the COVID-19 outbreak as cases in the state continued to rise.

86.     On March 11, 2020, President Donald J. Trump suspended travel from Europe, with the exception of the United Kingdom, and the WHO deemed COVID-19 a global "pandemic."

87.     On March 11, 2020, the NYDOH issued Guidance #20-10, which recognized that "older individuals, particularly those with other underlying health conditions, have shown greater susceptibility to the virus and often experience much more serious illness and outcomes" adding that "the potential for more serious illness among older adults, coupled with the communal nature

of adult care residential services, represents a risk of outbreak and a substantial challenge" for these types of adult care facilities.

88.     On March 13, 2020, seven days after recommending screening visitors, residential health care facility staff, and employees for symptoms of illness upon arriving at work, the NYDOH issued another Health Advisory addressed to residential health care facility facilities and adult care facilities, requiring, *inter alia*,   (i) the suspension of "all visitation expect when medically necessary", that "duration and number of visits should be minimized", that [v]isitors should wear a facemask while in the facility and should be allowed only in the resident's room"; (ii) the immediate implementation of "health checks for all [health care personnel] and other facility staff at the beginning of each shift…regardless of whether they are providing direct patient care";   (iii) that "all [health care personnel] and other facility staff shall wear a facemask while within 6 feet of residents"; (iv) that residential health care facility facilities "[n]otify the local health department and NYSDOH" of confirmed COVID-19 cases at their facilities; (v) that residential health care facility facilities "actively monitor all residents on affected units once per shift", including "a symptom check, vitals, lung auscultation, and pulse oximetry"; (vi) That they "assure that all residents in affected units remain in their rooms" and to "cancel group activities and communal dining"; (vii) that "residents must wear facemasks when [health care providers] or other direct care providers enter their rooms"; (viii) that staff not be floated between units; (ix) to "cohort residents with COVID-19 with dedicated [health care personnel] and other direct care providers";  (x) to "minimize the number of [health care personnel] and other direct care providers entering rooms"; and (xi) to place all residents on affected units "on droplet and contact precautions, regardless of the presence of symptoms and regardless of COVID-19 status", among other guidance.

89. On March 13, 2020, President Donald J. Trump declared a "national emergency".

90. On March 13, 2020, the Center for Medicare & Medicaid Services ("CMS") issued "Guidance for Infection Control and Prevention Concerning Coronavirus Disease 2019 (COVID-19) in Residential health care facility facilities (Revised)" that contained a specific section for limiting transmission of COVID in residential health care facility facilities with additional guidance including canceling community dining and group activities and reminding residents to practice social distancing.

91. On March 13, 2020, CMS a issued a memorandum entitled: Guidance for Infection Control and Prevention of Coronavirus Disease 2019 (COVID-19) in Residential health care facility facilities[2], which stated, in part:

- Prompt detection, triage and isolation of potentially infectious residents are essential to prevent unnecessary exposures among residents, healthcare personnel, and visitors at the facility;
- Facilities without an airborne infection isolation room (AIIR) are not required to transfer the resident assuming:
  - a) 1) the resident does not require a higher level of care; and
  - b) 2) the facility can adhere to the rest of the infection prevention and control practices recommended for caring for a resident with COVID-19;
- Facilities should restrict visitation of all visitors and non-essential health care personnel, except for certain compassionate care situations, such as an end-of-life situation. In those cases, visitors will be limited to a specific room only;
- Facilities are expected to notify potential visitors to defer visitation until further notice (through signage, calls, letters, etc.);
- Those with symptoms of a respiratory infection (fever, cough, shortness of breath, or sore throat) should not be permitted to enter the facility at any time (even in end-of-life situations);
- Cancel communal dining and all group activities, such as internal and external group activities;
- Remind residents to practice social distancing and perform frequent hand hygiene;
- Screen all staff at the beginning of their shift for fever and respiratory symptoms. Actively take their temperature and document absence of shortness

---

[2] https://www.cms.gov/files/document/3-13-2020-nursing-home-guidance-covid-19.pdf

of breath, new or change in cough, and sore throat. If they are ill, have them put on a facemask and self-isolate at home;

- Facilities should identify staff that work at multiple facilities (e.g., agency staff, regional or corporate staff, etc.) and actively screen and restrict them appropriately to ensure they do not place individuals in the facility at risk for COVID-19;

- Facilities should review and revise how they interact with vendors and receiving supplies, agency staff, EMS personnel and equipment, transportation providers (e.g., when taking residents to offsite appointments, etc.), and other non-health care providers (e.g., food delivery, etc.), and take necessary actions to prevent any potential transmission; and

- Take actions to mitigate any resource shortages and show they are taking all appropriate steps to obtain the necessary supplies as soon as possible.

92.     On March 15, 2020 the CDC issued guidance and advised that no gatherings of 50 or more people take place until further notice.

93.     On March 16, 2020, President Trump advised citizens to avoid groups of more than 10 individuals.

94.     On March 29, 2020, the United States accounted for the highest number of infections in the world, recording more than 140,000 cases and 2,000 deaths. On that same day, President Donald J. Trump announced an extension of "social distancing" guidelines.

95.     On April 17, 2020, the New York Times reported that approximately one fifth (or 20%) of all COVID-19 deaths were related to residential health care facility facilities[3].

96.     Just two days later, on April 19, 2020, CMS mandated new regulations that require all residential health care facility facilities in the United States to inform residents, their families, and representatives of any and all COVID-19 cases identified in the facility.

---

[3] https://www.nytimes.com/2020/04/17/us/coronavirus-nursing-homes.html

97. Based on data collected from long-term care facilities across the country, as of May 22, 2020, 43% of all COVID-19 deaths in the United States were residents of long-term care facilities, despite only comprising 0.62% of the nation's population.[4]

98. As of June 19, 2022, more than 200,000 residents and workers had died from COVID-19 at residential health care facility facilities and other long-term care facilities for older adults in the United States, according to various reports and databases.

99. Per New York Department of Health data, 17,400 (25%) of the 70,000+ reported COVID-19 deaths in New York State occurred in long-term care facilities.

100. Per the New York Department of Health, GWC-MILL BASIN, INC. had more than 100 positive COVID-19 cases in their facility among staff and residents, and at least 12 of its residents have died from COVID-19.

101. Plaintiff's decedent, JOSEPHINE DECICCO, was a resident of defendants' residential health care facility known as GWC-MILL BASIN, INC. D/B/A SUNRISE AT MILL BASIN, located at 5905 STRICKLAND AVE, BROOKLYN, NY 11234, County of KINGS, State of New York..

102. JOSEPHINE DECICCO was infected with and contracted COVID-19 while a resident at SUNRISE AT MILL BASINand subsequently died as a result of COVID-19 on 04/10/2020.

103. Per the New York Department of Health, the residential health care facility known as GWC-MILL BASIN, INC. and Sunrise at Mill Basin, located at 5905 STRICKLAND AVE, BROOKLYN, NY 11234, has been the subject of numerous complaints and received multiple citations for violations of federal and state public and safety health codes between 2018 and 2022.

---

[4] https://www.forbes.com/sites/theapothecary/2020/05/26/nursing-homes-assisted-living-facilities-0-6-of-the-u-s-population-43-of-u-s-covid-19-deaths/#593e28af74cd

104.   Plaintiff's claims against the Defendants can be distinguished into different time frames:

- First, prior to the pandemic, Defendants failed to have the appropriate policies, procedures, staffing and otherwise failed to be <u>prepared</u> for a foreseeable event such as an infectious disease exposure and outbreak;

- Second, after the pandemic begun and throughout the time periods referenced herein, the Defendants failed to properly <u>respond</u> to the pandemic.

105.   On February 1, 2019, CMS determined it was critical for facilities to include planning for infectious diseases within their emergency preparedness program.  Considering events such as the Ebola Virus and Zika, CMS determined that facilities should consider preparedness and infection prevention within their all-hazards approach.

106.   Per federal regulations, Medicare and Medicaid participating providers like GWC-MILL BASIN, INC. and Sunrise at Mill Basin have national emergency preparedness requirements regarding planning, preparing, and training for emergency situations.  This includes requirements for emergency plans, policies and procedures, communications, and staff training.

107.   As a direct and foreseeable consequence of the defendants' acts, omissions, and failures in taking safety precautions prior and during the COVID-19 pandemic, JOSEPHINE DECICCO sustained loss, damages, injury, and death, and her survivor and next of kin, Grace DeCicco, as Proposed Administrator of the Estate of JOSEPHINE DECICCO, has been damaged in an amount in excess of the jurisdictional limits of all lower courts in which this matter might otherwise have been brought.

108.   This action is brought due to JOSEPHINE DECICCO dying as a result of defendant's failure to protect its residents, including one JOSEPHINE DECICCO, from the SARS-Cov-2 ("COVID-19") virus before, during and throughout the outbreak and pandemic.

109.    The claims asserted herein are premised on negligence and gross negligence, wrongful death, and pursuat to New York State Public Health Law sec. 2801-d and 2803-c. Plaintiff also seeks recovery for punitive damages from the defendants based upon the foregoing causes of action, and because of conduct that was grossly reckless, in willful disregard, and wanton in the face of the COVID-19 outbreak and pandemic.

110.    Separate and apart to the claims made above regarding the COVID-19 pandemic, defendants were neglectful and failed to provide the plaintiff's decedent with appropriate care, failed provide to plaintiff's decedent such nursing and rehabilitation services as are customarily provided in a residential health care facility and rehabilitation facility, and was otherwise negligent in the care provided to the plaintiff's decedent.

## AS AND FOR A FIRST CAUSE OF ACTION
## PURSUANT TO NEW YORK PUBLIC HEALTH LAW
## 2801-d and 2803-c

111.    Plaintiff hereby incorporates by reference each of the preceding allegations as though set forth herein.

112.    At all times relevant to this complaint, including during the period of admission of plaintiff's decedent JOSEPHINE DECICCO to defendant's facility located at 5905 STRICKLAND AVE, BROOKLYN, NY 11234, County of KINGS, State of New York, defendants GWC-MILL BASIN, INC. and Sunrise at Mill Basin, had a statutorily mandated responsibility to provide plaintiff-decedent with the rights granted to residential health care facility residents by New York Public Health Law Section 2801-d.

113.    At all times relevant to this complaint, including during the period of admission of plaintiff's decedent JOSEPHINE DECICCO to defendant's facility, located at 5905 STRICKLAND AVE, BROOKLYN, NY 11234, County of KINGS, State of New York,

defendants GWC-MILL BASIN, INC. and Sunrise at Mill Basin, had a statutorily mandated responsibility to provide plaintiff-decedent with the rights granted to residential health care facility residents by New York Public Health Law Section 2803-c.

114. At all times relevant to this complaint, including during the period of admission of plaintiff's decedent JOSEPHINE DECICCO to defendant's facility, located at 5905 STRICKLAND AVE, BROOKLYN, NY 11234, County of KINGS, State of New York, defendantsGWC-MILL BASIN, INC. and Sunrise at Mill Basin, by their respective officers, employees, agents and/or servants, violated Public Health Law §2801-d.

115. At all times relevant to this complaint, including during the period of admission of plaintiff's decedent JOSEPHINE DECICCO to defendant's facility, located at 5905 STRICKLAND AVE, BROOKLYN, NY 11234, County of KINGS, State of New York, defendantsGWC-MILL BASIN, INC. and Sunrise at Mill Basin failed to provide the plaintiff-decedent appropriate ordinary care.

116. At all times relevant to this complaint, including during the period of admission of plaintiff's decedent JOSEPHINE DECICCO to defendant's facility, located at 5905 STRICKLAND AVE, BROOKLYN, NY 11234, County of KINGS, State of New York, defendantsGWC-MILL BASIN, INC. and Sunrise at Mill Basin provided plaintiff-decedent care below acceptable standards.

117. At all times relevant to this complaint, including during the period of admission of plaintiff's decedent JOSEPHINE DECICCO to defendant's facility, located at 5905 STRICKLAND AVE, BROOKLYN, NY 11234, County of KINGS, State of New York, the defendantsGWC-MILL BASIN, INC. and Sunrise at Mill Basin, through their employees, agents,

consultants, and independent contractors, deprived the plaintiff's decedent of her rights pursuant to Public Health Law Section 2801-d.

118.    At all times relevant to this complaint, including during the period of admission of plaintiff's decedent JOSEPHINE DECICCO to defendant's facility, located at 5905 STRICKLAND AVE, BROOKLYN, NY 11234, County of KINGS, State of New York, defendantsGWC-MILL BASIN, INC. and Sunrise at Mill Basin also deprived the plaintiff-decedent of rights pursuant to Public Health Law Section 2803-c.

119.    The acts and/or omissions committed by the respective officers, employees, agents, independent contractors and/or servants of defendantsGWC-MILL BASIN, INC. and Sunrise at Mill Basin, were pervasive events that occurred and continued throughout plaintiff's decedent's residency at defendant's facility, and were such that the supervisors, administrators and managing agents of defendants should have been aware of them.

120.    DefendantsGWC-MILL BASIN, INC. and Sunrise at Mill Basin, through their respective officers, employees, agents, independent contractors and/or servants, wholly failed to discharge their respective obligations and duty of care to plaintiff's decedent as required by statute and as set forth herein.  Consequently, plaintiff's decedent suffered catastrophic injuries, extreme conscious pain, suffering, and mental anguish.

121.    The scope and severity of the recurrent statutory violations inflicted upon plaintiff's decedent while she was under the care of defendants' facility accelerated the deterioration of her health and physical condition beyond that caused by the normal aging process, resulting in her physical and emotional trauma described herein and hastened her death. More specifically, plaintiff-decedent's agonizing pain, suffering and death was precipitated by each defendant's

failure to adhere to the duties set forth herein, as well as statutory, licensing, and regulatory rules for the United States, State of New York, and County of KINGS.

122.   At all times relevant to this complaint, defendantsGWC-MILL BASIN, INC. and Sunrise at Mill Basin had a duty to plaintiff's decedent to ensure that their staff consisted of an adequate number of qualified employees and/or independent contractors, both licensed and unlicensed, so that such employees and/or independent contractors could deliver care and services to plaintiff's decedent in a reasonably safe and beneficial manner.

123.   At all times relevant to this complaint, defendantsGWC-MILL BASIN, INC. and Sunrise at Mill Basin's responsibilities and obligations, as outlined in Public Health Law Section 2803-c, are non-delegable, and each defendant has direct and vicarious liability for violations, deprivations and infringements of such responsibilities and obligations by any person or entity under each defendant's control, direct or indirect, including its employees, agents, consultants, servants and independent contractors, whether in-house or outside entities, individuals, agencies or pools, or if caused by each defendant's policies, whether written or unwritten, or common practices.

124.   The aforesaid violations by each defendant were a proximate cause of plaintiff's decedent JOSEPHINE DECICCO's injuries, conscious pain, and suffering, and ultimately her death.

125.   By reason of the foregoing, plaintiff Grace DeCicco, as next of Kin and Proposed Administrator of the Estate of JOSEPHINE DECICCO, has been damaged in an amount in excess of the jurisdictional limits of all lower courts in which this matter might otherwise have been brought.

126.    Also, in addition to the damages suffered by plaintiff's decedent as a result of each of defendant's deprivation of her rights as a residential health care facility resident, plaintiff is entitled to recover attorneys' fees pursuant to Public Health Law Section 2801-d(6), punitive damages pursuant to Public Health Law Section 2801-d(2), and costs.

127.    That by reason of the foregoing, plaintiff Grace DeCicco, as Proposed Administrator of the Estate of JOSEPHINE DECICCO, additionally demands as damages, per diem damages based upon the reasonable value of legal services rendered pursuant to Public Health Law §2801-d.

## AS AND FOR A SECOND CAUSE OF ACTION PURSUANT TO
## NEW YORK PUBLIC HEALTH LAW §4662, §4657, §4659 and 10 NYCRR 1001

128.    Plaintiff hereby incorporates by reference each of the preceding allegations as though set forth herein.

129.    That at all times hereinafter mentioned, during Josephine DeCicco's  stay at Defendant GWC-MILL BASIN, INC.'s assisted living facility, she was forced to undergo medical treatment, incur medical expenses, suffer disability, pain and suffering, mental anguish, loss of enjoyment of life, mental and physical deterioration, secondary to inadequate supervision resulting in death, caused by negligence of Defendant GWC-MILL BASIN, INC. and violation of Defendant GWC-MILL BASIN, INC.'s contract with Plaintiff Josephine DeCicco, laws, rules, statutes and ordinances without any negligence on the part of the Plaintiff Josephine DeCicco.

130.    That at all times hereinafter mentioned, Plaintiff Josephine DeCicco's injuries were substantially contributed to by the negligent acts and/or omissions of the Defendants as well as the violation of the resident's rights pursuant to New York Public Health Law §4662, §4657, §4659 and 10 NYCRR 1001.

131. That at all times hereinafter mentioned, Defendants had a statutorily mandated responsibility to provide Plaintiff Josephine DeCicco with the rights granted to assisted living residents by New York Public Health Law §4662, §4657, §4659 and 10 NYCRR 1001.

132. That at all times hereinafter mentioned, Defendants' responsibilities and obligations to Plaintiff Josephine DeCicco, as outlined in Public Health Law, are nondelegable and Defendants had direct and/or vicarious liability for violations, deprivations and infringements of such responsibilities and obligations by any person or entity under Defendants' control, direct or indirect, including their employees, agents, consultants and independent contractors, whether in-house or outside entities, individuals, agencies, pools, or caused by Defendant's policies, whether written or unwritten, or common practices.

133. That at all times hereinafter mentioned, Defendants, their employees, agents, consultants and independent contractors, deprived Plaintiff Josephine DeCicco of the rights granted to her pursuant to Public Health Law §4662, §4657, §4659 and 10 NYCRR 1001.

134. That at all times hereinafter mentioned, the acts and omissions committed by employees and agents of the Defendants were pervasive events that occurred and continued throughout Plaintiff Josephine DeCicco's residency and were such that supervisors, administrators and managing agents of Defendants should have been aware of them.

135. That at all times hereinafter mentioned, in addition to the damages suffered by Plaintiff Josephine DeCicco as the result of Defendants' deprivation of her rights as an assisted living resident, Plaintiff Josephine DeCicco, is entitled to recovery of compensatory damages pursuant to Public Health Law and costs.

136.     That at all times hereinafter mentioned, as a result of the foregoing acts and/or omissions, Plaintiff Josephine DeCicco was denied her rights under Public Health Law §4662, §4657, §4659 and 10 NYCRR 1001, and such denial caused injury.

137.     That by reason of the foregoing, Plaintiff Josephine DeCicco was forced to undergo medical treatment, incurred medical expense, suffered disfigurement, disability, pain and suffering, mental anguish, loss of enjoyment of life, and loss of dignity.

138.     That at all times hereinafter mentioned, as a result of the foregoing, Plaintiff was damaged in a sum which exceeds the jurisdictional limits of all lower Courts.

### AS AND FOR A THIRD CAUSE OF ACTION
### FOR NEGLIGENCE PRE COVID-PANDEMIC

139.     Plaintiff hereby incorporates by reference each of the preceding allegations as though set forth herein.

140.     Prior to and at all times hereinafter mentioned, defendant owed a duty to residents of their residential health care facility, including plaintiff-decedent, to protect their residential health care facility resident's rights pursuant to Public Health Law Section 2801-d, and as enumerated in Public Health Law Section 2803-c, and pursuant to common law.

141.     That the medical and health-related care and services, treatment, and services rendered to plaintiff's decedent, JOSEPHINE DECICCO, by the defendants GWC-MILL BASIN, INC. and Sunrise at Mill Basin, was rendered carelessly, unskillfully, negligently, and not in accordance with accepted standards of care, practice, treatment and services.

142.     Prior to and at all times hereinafter mentioned, defendants GWC-MILL BASIN, INC. and Sunrise at Mill Basin, any and/or all of them, as well as each of its officers, principals, employees, agents, supervisors, staff, independent medical personnel and independent contractors,

both licensed and unlicensed, had a duty to provide ordinary care and exercise the degree of care and skill exercised by residential health care facility facilities in the community and consistent with the expertise which defendant publicized to the community.

143. Prior to and at all times hereinafter mentioned, defendants GWC-MILL BASIN, INC. and Sunrise at Mill Basin, owed a duty to plaintiff's decedent to hire, train and supervise employees and independent contractors, both licensed and unlicensed, so that such employees and independent contractors delivered care and services to plaintiff-decedent in a reasonably safe and beneficial manner.

144. Prior to and at all times hereinafter mentioned, defendants owed a duty to plaintiff-decedent to have adequate staffing so that such employees and independent contractors delivered care and services to plaintiff-decedent in a reasonably safe and beneficial manner.

145. Prior to and at all times hereinafter mentioned, defendants negligently breached their duties owed to plaintiff's decedent by statutes and common law.

146. Prior to the beginning of the COVID-19 pandemic in February/March 2020, defendants failed to take the proper steps to protect the residents and/or patients at their facilities from foreseeable events and outbreaks, such as COVID-19.

147. Prior to the beginning of the COVID-19 pandemic in February/March 2020, defendants failed to have proper policies and procedures in place, and to take steps to have preparations in place, such as proper staffing levels, proper infectious disease policies and procedures, proper available PPE, and other such steps which would have mitigated or completely avoided its effects.

148. Defendants failed to appropriately separate residents in accordance with local, state, and federal guidance.

149. Defendants failed to monitor local, state, and federal health guidance on the coronavirus for maintaining the safety of its residents.

150. Because of defendants' failures in this regard, JOSEPHINE DECICCO, a resident/patient, died on 04/10/2020.

151. JOSEPHINE DECICCO'S death as a resident/patient was a direct result of defendants' failures to take measures to protect her at the residential health care facility from the deadly COVID-19 virus, and because of their negligence, gross negligence, and residential health care facility malpractice.

152. Prior to and at all times hereinafter mentioned, as a result of defendants GWC-MILL BASIN, INC. and Sunrise at Mill Basin foregoing acts and/or omissions, plaintiff's decedent was subject to each of defendant's negligence, causing her to be forced to undergo medical treatment, incur medical expenses, suffer disability, pain and suffering, mental anguish, loss of enjoyment of life, mental and physical deterioration, secondary to inadequate supervision resulting in death. Plaintiff also alleges *res ipsa loquitor*.

153. Prior to and at all times hereinafter mentioned, plaintiff-decedent's injuries and death were caused wholly and solely by the negligent acts and/or omissions of the defendant herein.

154. By reason of the foregoing, plaintiff Grace DeCicco, as Proposed Administrator of the Estate of JOSEPHINE DECICCO, has been damaged in an amount in excess of the jurisdictional limits of all lower courts in which this matter might otherwise have been brought.

**AS AND FOR A FOURTH CAUSE OF ACTION
FOR NEGLIGENCE FOLLOWING THE BEGINNING OF THE PANDEMIC AND
COVID-19 EXPOSURE AND SPREAD**

155. Plaintiff hereby incorporates by reference each of the preceding allegations as though set forth herein.

156. Prior to and at all times hereinafter mentioned, defendant owed a duty to residents of their residential health care facility, including plaintiff-decedent, to protect their residential health care facility resident's rights pursuant to Public Health Law Section 2801-d, and as enumerated in Public Health Law Section 2803-c, and pursuant to common law.

157. That the medical and health-related care and services, treatment, and services rendered to plaintiff's decedent, JOSEPHINE DECICCO, by the defendants GWC-MILL BASIN, INC. and Sunrise at Mill Basin, was rendered carelessly, unskillfully, negligently, and not in accordance with accepted standards of care, practice, treatment, and services.

158. Prior to and at all times hereinafter mentioned, defendantsGWC-MILL BASIN, INC. and Sunrise at Mill Basin, any and/or all of them, as well as each of its officers, principals, employees, agents, supervisors, staff, independent medical personnel and independent contractors, both licensed and unlicensed, had a duty to provide ordinary care and exercise the degree of care and skill exercised by residential health care facility facilities in the community and consistent with the expertise which defendant publicized to the community.

159. Prior to and at all times hereinafter mentioned, defendantsGWC-MILL BASIN, INC. and Sunrise at Mill Basin, owed a duty to plaintiff's decedent to hire, train and supervise employees and independent contractors, both licensed and unlicensed, so that such employees and independent contractors delivered care and services to plaintiff-decedent in a reasonably safe and beneficial manner.

160.     Prior to and at all times hereinafter mentioned, defendants owed a duty to plaintiff-decedent to have adequate staffing so that such employees and independent contractors delivered care and services to plaintiff-decedent in a reasonably safe and beneficial manner.

161.     Prior to and at all times hereinafter mentioned, defendants negligently breached their duties owed to plaintiff's decedent by statutes and common law.

162.     At all times relevant to this complaint, defendant GWC-MILL BASIN, INC. did not exercise reasonable and due care and the level of diligence and competence required of a long-term skilled health-related care and services facility, as the following general isolation and infection control and prevention procedures were required to be implemented by nursing staff:

    a.  Establish and maintain an infection prevention and control program designed to provide a safe, sanitary, and comfortable environment to prevent the development and transmission of communicable diseases and infections;

    b.  Establish and maintain a system for preventing, identifying, reporting, investigating, and controlling infections and communicable diseases for all residents, staff, volunteers, visitors, and other individuals providing nursing services;

    c.  The levels and amount of nursing staff available and staffed each shift must be continually and appropriately increased in order to adequately provide care and treatment to residents in accordance to facility, state, and federal infection control and prevention regulations, policies and procedures;

    d.  Staff, at all times, must be required to utilize PPE when providing care and treatment to residents that are suspected to be positive for an infectious disease, as well as residents who verbally communicate and/or physically present with symptoms consistent with an infectious and communicable disease;

    e.  Staff, at all times, must be required to utilize PPE when providing care and treatment to residents when there is an outbreak of infectious and communicable disease in the facility;

    f.  Staff, at all times, must be required to wash their hands after each direct resident contact;

g.  Prohibit any employees suspected to have contracted a communicable disease or illness, as well as employees who have tested positive for a communicable disease or illness, from entering the facility, and from having any direct contact with residents;

h.  Personnel must handle, store, process, and transport linens so as to prevent the spread of any infection;

i.  When residents are isolated due to the presence and/or outbreak of a highly contagious and communicable virus, any health care professionals assigned to the care and treatment of the infected resident must only be assigned to that resident and/or other residents who have been identified with the same infection;

j.  Health care professionals working on an isolated care unit due to an infectious outbreak must have designated a restroom(s), break room(s), and work area(s) that are separate from other health care professionals working on non-isolated and non-infectious units;

k.  Maintain and have available portable x-ray equipment in resident cohort areas to reduce the need for patient transport and acute hospitalization;

l.  In the event of any infectious disease or illness outbreak in a long-term care facility, the facility must purchase, provide, and maintain sufficient facemasks and/or facial coverings for all residents in order to contain infectious secretions and the spread of respiratory droplets in any communal areas;

m.  In the event of any infectious disease or illness outbreak in a long-term care facility, the facility must temporarily halt admissions to the facility until the extent of transmission can be clarified, and interventions are implemented;

n.  In the event of any infectious disease or illness outbreak in a long-term care facility, the facility must encourage all residents to restrict themselves to their room to the extent possible; and

o.  In the event of any infectious disease or illness outbreak in a long-term care facility, the staff must provide physical assistance to any residents who are unable to "socially distance" themselves from others due to the resident's physical, mental, and/or underlying medical condition(s).

158.     At all times relevant to this complaint, defendant GWC-MILL BASIN, INC. did not exercise reasonable and due care and the level of diligence and competence required of a long-term skilled health-related care and services facility, as the following COVID-19 isolation and infection control and prevention procedures, in addition to the general isolation and infection control and prevention procedures aforementioned, were required to be implemented by nursing staff:

a.     Establish and maintain a specific COVID-19 infection prevention and control program designed to provide a safe, sanitary, and comfortable environment to prevent the development and transmission of COVID-19;

b.     Establish and maintain a system to identify, investigate, and control COVID-19 infections, which includes, but is not limited to, screening all residents of a long-term care facility for COVID-19 symptoms and elevated temperature, heart rate, respirations, and pulse oximetry;

c.     As a measure to limit long-term care resident's exposure to COVID-19, the facility must designate entire units within the facility to care for residents with known cases and/or suspected cases of COVID-19;

d.     As a measure to conserve PPE for professional health care workers and other staff in caring for residents of long-term care facilities, the facility must designate entire units within the facility for residents with known cases and/or suspected cases of COVID-19;

e.     As a measure to limit long-term care resident's exposure to COVID-19, the facility must assign specific and consistent members of the nursing staff to residents with known cases and/or suspected cases of COVID-19, and further limit the designated staff from providing care to negative or asymptomatic residents;

f.     As a measure to conserve PPE for professional health care workers and other staff in caring for residents of long-term care facilities, the facility must assign specific and consistent members of the nursing staff to residents with known cases and/or suspected cases of COVID-19, and further limit the designated staff from providing care to negative or asymptomatic residents;

g.     Ensure the levels and amount of nursing staff available and staffed each shift is increased as necessary, and in accordance to facility, state, and federal infection control and prevention regulations, policies and procedures, in

order to adequately provide care and treatment to residents with and without COVID-19;

h.      Residents with confirmed COVID-19 or displaying any respiratory symptoms should receive all services in room with door closed (meals, physical and occupational therapy, activities, and personal hygiene, etc.);

i.      Restrict visitation of all visitors and non-essential health care personnel into the facility, but encourage other forms visitation and communication such as telephone calls or electronic video conferencing;

j.      Facilities must screen any and all persons that enter a long-term care facility, including all staff at the beginning of each shift, which includes, but is limited to, temperature checks, requiring and/or providing masks or face covering prior to entering the facility, issuance of a questionnaire regarding symptoms and potential exposure, and physical observation of any signs or symptoms;

k.      All group activities and communal dining must be canceled until further guidance provides for their continuation;

l.      Long-term care facilities must disinfect frequently touched surfaces at a minimum of every two hours with EPA registered and approved products;

m.      Residents in a long-term care facility who develop symptoms consistent with COVID-19 must be removed from the general resident population and isolated in quarantine until a COVID-19 test is administered and results are received;

n.      Residents in a long-term care facility who develop symptoms consistent with COVID-19 must not be placed or reside in a room with a new admission, nor should they be moved to the designated COVID-19 care unit unless the symptomatic resident is confirmed to be positive for COVID-19 by testing;

o.      If a long-term care resident tests positive for COVID-19 and/or if the resident displays or reports signs and symptoms of a respiratory viral infection, staff must frequently and accurately obtain and then immediately document resident vital signs, including temperature, respirations, heart rate, and pulse oximetry;

p.      Any resident identified with symptoms of fever and lower respiratory illness (cough, shortness of breath, sore throat) should be immediately placed in both contact and droplet transmission-based precautions;

q.      Roommates of residents who are positive for COVID-19 should be considered exposed and potentially infected and, should not be allowed to share rooms with other residents unless they remain asymptomatic and/or

have tested negative for COVID-19 for a minimum of 14 days after their last exposure;

r.    Positive COVID-19 residents of a long-term care facility should reside in the same room/location for the entire duration and course of illness so as to reduce the chance of transmission to others;

s.    Positive and/or symptomatic COVID-19 residents should be given a surgical mask encouraged to wear at all times, especially when in close contact with others;

t.    Positive and/or symptomatic COVID-19 residents should be provided with all nursing, rehabilitative, medication, and treatment services in their designated room/space;

u.    Residents confirmed to be positive for COVID-19, regardless of the presentation of their symptoms, should be transferred to a designated COVID-19 care unit;

v.    Long-term care facilities must have a plan and specific protocols in place for managing new admissions and readmissions of residents whose COVID-19 status is unknown;

w.    If a resident of a long-term care facility is positive and/or displaying symptomology of COVID-19 and is discharged from the facility, all staff, including nursing personnel and environmental/janitorial personnel must refrain from entering the vacated room until sufficient time has elapsed for enough air changes to remove potentially infectious particles;

x.    If a resident of a long-term care facility is positive and/or displaying symptomology of COVID-19 and is discharged from the facility, the vacated room must undergo appropriate cleaning and surface disinfection before it is returned to routine use;

y.    Long-term care facility must not cohort residents on the same unit based on COVID-19 symptoms alone, as that practice increases the risk of transmission between infected and non-infected residents;

z.    Residents being re-admitted to a long-term care facility who is known or suspected to be positive for COVID-19 must be admitted to a single-person room and/or be designated to a room without a roommate;

aa.    Screen all staff at the beginning of their shift for fever and respiratory symptoms by actively taking staff members' temperatures, and document any absence of fever, shortness of breath, new or change in cough, and sore throat before the staff is allowed into the facility;

    bb.    Identify any staff that work at multiple facilities (e.g., agency staff, regional or corporate staff, etc.), and actively screen and restrict those individuals' access to the facility and/or to residents if they have been exposed to COVID-19 and/or show signs and symptoms of the same; and

    cc.    Provide alcohol-based hand disinfectant/hygiene products both inside and outside of residents' rooms, at all entrances, and throughout any and all clinical areas.

159.    Any failures of a long-term care facility to implement the foregoing COVID-19 isolation and infection control and prevention procedures constitutes a failure to exercise reasonable and due care.

160.    Defendant GWC-MILL BASIN, INC., through its actual, implied, and/or apparent agents, servants, and employees, engaged in the following acts and/or omissions:

    a.    Failed to develop appropriate infection control and prevention policies and procedures;

    b.    Failed to develop and implement COVID-19 isolation and infection control and prevention procedures that were specifically tailored to GWC-MILL BASIN, INC.;

    c.    Failed to implement appropriate interventions related to infection control and prevention;

    d.    Failed to screen all residents, including JOSEPHINE DECICCO, for COVID-19 symptoms and elevated temperature, heart rate, respirations, and pulse oximetry;

    e.    Negligently instructed one or more members of the Defendant's nursing staff to continue to come into GWC-MILL BASIN, INC. and provide direct care to elderly residents, including JOSEPHINE DECICCO;

    f.    Failed to frequently obtain vitals for all residents, including JOSEPHINE DECICCO, for signs/symptoms of a respiratory distress, fever, cough, all of which are known signs/symptoms of COVID-19;

    g.    Failed to timely isolate residents suspected and/or symptomatic of COVID-19 from the general resident population;

h.  Failed to provide, maintain, monitor and/or employ standard contact and droplet precautions and PPE;

i.  Failed to ensure sufficient levels of staff to provide skilled health-related care and services and treatment to all residents, including JOSEPHINE DECICCO, in accordance with their care plans;

j.  Failed to ensure sufficient levels of staff to limit the nursing staff caring and/or assigned to positive or symptomatic residents from providing any care to negative or asymptomatic residents;

k.  Failed to provide positive or symptomatic patients with surgical masks and other protective interventions to help reduce transmission;

l.  Failed to immediately isolate residents identified with symptoms of fever and lower respiratory illness, including, but not limited to cough, shortness of breath, and sore throat;

m.  Failed to maintain isolation protocols for residents identified with symptoms of fever and lower respiratory illness up to and until staff obtained a physician order that discontinued isolation protocol;

n.  Failed to provide all resident services, including, but not limited to meals, physical and occupational therapy, social service activities, and personal hygiene in residents' designated rooms with the door closed for both suspected and confirmed COVID-19 residents, and/or any resident displaying acute respiratory symptoms;

o.  Failed to disinfect frequently touched surfaces at a minimum of every two hours with EPA registered and approved products;

p.  Failed to adhere to, and/or have in place, cleaning and disinfection policies and procedures;

q.  Failed to purchase, provide, maintain, monitor and/or employ adequate PPE;

r.  Failed to limit access to the GWC-MILL BASIN, INC. facility to any and all individuals that were not essential employees and/or nursing staff personnel;

s.  Failed to ensure adequate levels of hand hygiene, hand washing, and/or alcohol-based hand disinfectant products/equipment;

t.  Failed to provide alcohol-based hand disinfectant/hygiene products both inside and outside of residents' rooms, including JOSEPHINE DECICCO's, at all entrances, and throughout any and all clinical areas;

u.  Failed to provide appropriate and sufficient levels of nursing staff to meet the daily needs of its' residents, including JOSEPHINE DECICCO;

v.  Failed to take appropriate action after residents, including JOSEPHINE DECICCO, displayed and/or complained of symptoms of fever and lower respiratory illness, including, but not limited to cough, shortness of breath, and sore throat;

w.  Negligently accepted new admissions and/or re-admissions of residents that were symptomatic and/or tested positive for COVID-19;

x.  Negligently cohorted suspected and/or positive COVID-19 residents with (at the time) non-COVID-19 residents;

y.  Failed to test JOSEPHINE DECICCO for COVID-19 despite her presentation and complaints of COVID-19 symptoms, including, but not limited to, fever, cough, general but articulable malaise, and shortness of breath;

z.  Failed to communicate to JOSEPHINE DECICCO's physician the need to test her for COVID-19 after she presented with COVID-19 symptoms, including, but not limited to, fever, cough, general but articulable malaise, and shortness of breath;

aa.  Failed to maintain sufficient nursing staff to provide nursing and related services to attain or maintain JOSEPHINE DECICCO's highest practicable physical, mental, and psychosocial wellbeing as determined by JOSEPHINE DECICCO's assessments and individual plans of care;

bb.  Failed to operate and provide services in compliance with all applicable professional standards in ways including, but not limited to, maintaining adequate documentation in JOSEPHINE DECICCO's clinical record; and

cc.  Failed to promote care for residents in a manner and in an environment that maintains or enhances each resident's dignity and respect, including JOSEPHINE DECICCO, in full recognition of her individuality;

dd.  Failed to follow, encourage, and enforce social distancing among residents and staff;

ee.  Failed to cancel all group activities and communal dining;

ff.  Failed to timely restrict all visitors;

gg. Failed to follow, encourage, and enforce proper mask wearing procedures and protocols;

hh. Failed to adequately screen volunteers and non-essential healthcare personnel prior to allowing their entrance into the facility.

161. Because of defendants' failures in this regard, JOSEPHINE DECICCO, a resident/patient, died on 04/10/2020, due to complications as a result of COVID-19 infection.

162. JOSEPHINE DECICCO's death as a resident/patient was a direct result of defendants' failures to take measures to protect her at the residential health care facility from the deadly COVID-19 virus, and because of their negligence, gross negligence, and residential health care facility malpractice.

163. Prior to and at all times hereinafter mentioned, as a result of defendantsGWC-MILL BASIN, INC. and Sunrise at Mill Basin foregoing acts and/or omissions, plaintiff's decedent was subject to each of defendant's negligence, causing her to be forced to undergo medical treatment, incur medical expenses, suffer disability, pain and suffering, mental anguish, loss of enjoyment of life, mental and physical deterioration, secondary to inadequate supervision resulting in death. Plaintiff also alleges *res ipsa loquitor*.

164. Prior to and at all times hereinafter mentioned, plaintiff-decedent's injuries and death were caused wholly and solely by the negligent acts and/or omissions of the defendant herein.

165. By reason of the foregoing, plaintiff Grace DeCicco, as Proposed Administrator of the Estate of JOSEPHINE DECICCO, has been damaged in an amount in excess of the jurisdictional limits of all lower courts in which this matter might otherwise have been brought.

**AS AND FOR A FIFTH CAUSE OF ACTION FOR NEGLIGENCE *PER SE*
AGAINST ALL DEFENDANTS**

166. Plaintiff hereby incorporates by reference each of the preceding allegations as though set forth herein.

167. That at all times relevant hereto, including during the period of the admission of plaintiff's decedent JOSEPHINE DECICCO to defendant's facility located at 5905 STRICKLAND AVE, BROOKLYN, NY 11234, County of KINGS, State of New York, defendantsGWC-MILL BASIN, INC. and Sunrise at Mill Basin, by their respective officers, employees, agents and/or servants, were negligent in the operation of that facility and particularity in the care rendered to plaintiff's decedent JOSEPHINE DECICCO, and defendants' violations of 42 C.F.R. §483.25 of the OBRA regulations and other Federal rules and regulations, and of 10 NYCRR §415 and other New York State and County rules and regulations, federal statutes, New York State statutes, and Public Health Law §§2801-d and 2803-c.

168. Defendants violated OBRA, as well as New York regulations, which established the minimum standard of care to be followed by defendants, including but not limited to the following:

    a. Pursuant to 42 C.F.R. § 483.10, defendants and their staff had a duty to assure that residents' rights were followed and to ensure that each resident, including plaintiff's decedent, had a dignified existence and the right to exercise his or her rights as a resident and citizen of the United States.

    b. Pursuant to 42 C.F.R. § 483.30, defendants and their staff had a duty to provide sufficient nursing staff to provide nursing and related services to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident, as determined by the resident's assessment and individual plans of care.

    c. Pursuant to 42 C.F.R. § 483.71, defendants and their staff had a duty to administer the residential health care facility in a manner that enabled it to use its resources effectively and efficiently to attain or maintain the highest practicable physical, mental and psychosocial well-being of each resident and to operate and provide services and compliance with all applicable federal, state and local laws, regulations, and codes of accepted professional standards.

169.     That as a consequence of each defendant's failure to adhere to the duties set forth herein, as well as statutory, licensing, and regulatory rules of the United States, State of New York, and County of KINGS each defendant is liable under the principals of *negligence per se.*

170.     That at all times relevant hereto, the aforesaid legislative commands and administrative regulations were designed to prevent injury to the class of persons to which plaintiff's decedent, JOSEPHINE DECICCO, belonged.

171.     That the aforesaid violations by each defendant were a proximate cause of plaintiff's decedent JOSEPHINE DECICCO'S injuries.

172.     That because of the foregoing, plaintiff's decedent JOSEPHINE DECICCO was seriously injured.

173.     That because of the foregoing, plaintiff's decedent JOSEPHINE DECICCO was caused to sustain conscious pain and suffering.

174.     That because of the foregoing, plaintiff's decedent JOSEPHINE DECICCO was caused to be seriously injured and her injuries were a cause of her death.

175.     That because of the foregoing, plaintiff's decedent JOSEPHINE DECICCO was caused to sustain conscious pain and suffering prior to her death.

176.     By reason of the foregoing, plaintiff Grace DeCicco, as Proposed Administrator of the Estate of JOSEPHINE DECICCO, has been damaged in an amount in excess of the jurisdictional limits of all lower courts in which this matter might otherwise have been brought.

## AS AND FOR A SIXTH CAUSE OF ACTION
## FOR CONSCIOUS PAIN AND SUFFERING

177.     Plaintiff hereby incorporates by reference each of the preceding allegations as though set forth herein.

178.	By reason of the foregoing, the plaintiff-decedent sustained severe multiple injuries in, to, and about her body resulting in wrongful death.

179.	By reason of the foregoing, the plaintiff-decedent suffered excruciating pain and agony, including fear of imminent death.

180.	That as a result of the aforesaid, the Estate of JOSEPHINE DECICCO sustained damages in a sum which exceeds the jurisdictional limits of all lower courts which would have jurisdiction of this matter.

## AS AND FOR A SEVENTH CAUSE OF ACTION
## FOR WRONGFUL DEATH

181.	Plaintiff hereby incorporates by reference each of the preceding allegations as though set forth herein.

182.	Defendants owed a duty to JOSEPHINE DECICCO and the residents and/or patients at their facility, to keep them safe from outside diseases and/or outbreaks of the virus.

183.	Defendants breached their duty to JOSEPHINE DECICCO and failed to take the proper steps to protect their residents and/or patients at their facility, including plaintiff-decedent, from the COVID-19 virus.

184.	By reason of the foregoing, the plaintiff-decedent sustained severe bodily injuries resulting in wrongful death.

185.	By reason of the foregoing, the plaintiff's decedent JOSEPHINE DECICCO left surviving next of kin and distributees.

186.	As a result of the foregoing, the plaintiff's decedent's surviving next of kin and distributees became liable for, and expended money for, funeral and other expenses.

187.	As a result of the foregoing, the plaintiff's decedents' surviving next of kin and distributees suffered pecuniary damages.

188.    As a result of the foregoing, the plaintiff's decedent's surviving next of kin sustained all other damages allowed by law.

189.    By reason of the foregoing, plaintiff Grace DeCicco, as Proposed Administrator of the Estate of JOSEPHINE DECICCO, has been damaged in an amount in excess of the jurisdictional limits of all lower courts in which this matter might otherwise have been brought.

## AS AND FOR A EIGHTH CAUSE OF ACTION FOR GROSS NEGLIGENCE

190.    Plaintiff hereby incorporates by reference each of the preceding allegations as though set forth herein.

191.    Prior to and at all times hereinafter mentioned, defendantsGWC-MILL BASIN, INC. and Sunrise at Mill Basin, through their respective officers, employees, agents, representatives, servants and independent contractors, acted in so careless a manner as to show complete disregard for the rights and safety of plaintiff's decedent.

192.    Prior to and at all times hereinafter mentioned, defendantsGWC-MILL BASIN, INC. and Sunrise at Mill Basin, through their respective officers, employees, agents, representatives, servants and independent contractors, acted and/or failed to act knowing that their conduct would probably result in injury or damage to plaintiff's decedent JOSEPHINE DECICCO.

193.    Prior to and at all times hereinafter mentioned, defendantsGWC-MILL BASIN, INC. and Sunrise at Mill Basin, through their respective officers, employees, agents, representatives, servants and independent contractors, acted in so reckless a manner and/or failed to act in circumstances where an act was clearly required, so as to indicate complete disregard of the consequences of their actions and/or inactions.

194.    Defendant, GWC-MILL BASIN, INC., by and through its actual, implied, and/or apparent agents, servants, and employees failed to timely, appropriately, and consistently implement and monitor proper infection control policies and procedures.

195.    At all times relevant to this complaint, defendant GWC-MILL BASIN, INC. did not act in a reasonably careful manner when the residential health care facility failed to hire additional staff members, and failed to implement additional facility-wide infection control and prevention protocols so that GWC-MILL BASIN, INC. had a capacity to provide care in compliance with its own written policies and procedures, as well as the appropriate standards of practice per New York Department of Health.

196.    When a skilled nursing facility does not adequately and/or timely implement infection control procedures and prevention safeguards, it is foreseeable that residents of the facility will suffer from serious medical complications and death when there is an outbreak of a highly contagious and communicable respiratory illness.

197.    At all times relevant to this complaint, defendant GWC-MILL BASIN, INC. consciously disregarded the health and safety of residents, including JOSEPHINE DECICCO, by both failing to hire additional staff members, and failing to implement additional facility-wide infection control and prevention protocols so that its residential health care facility had the capacity to provide care in compliance with its own written policies and procedures, as well as the appropriate standards of practice per the New York Department of Health.

198.    When a skilled nursing facility has received multiple and repeated citations from the New York Department of Health for failure to comply with infection control and prevention regulations and procedures, it is foreseeable that residents of that facility will suffer from serious

medical complications and death when there is an outbreak of a highly contagious and communicable respiratory illness.

199.    Defendant GWC-MILL BASIN, INC., through its actual, implied, and/or apparent agents, servants, and employees, willfully, and with conscious disregard for the safety of its residents, including JOSEPHINE DECICCO, repeatedly engaged in the following acts and/or omissions:

a. Intentionally, recklessly and/or repeatedly failed to develop appropriate infection control and prevention policies and procedures;

b. Intentionally, recklessly and/or repeatedly failed to develop and implement COVID-19 isolation and infection control and prevention procedures that were specifically tailored to GWC-MILL BASIN, INC.;

c. Intentionally, recklessly and/or repeatedly failed to implement appropriate interventions related to infection control and prevention;

d. Intentionally, recklessly and/or repeatedly failed screen all residents, including JOSEPHINE DECICCO, for COVID-19 symptoms and elevated temperature, heart rate, respirations, and pulse oximetry;

e. Intentionally, recklessly and/or consciously disregarded JOSEPHINE DECICCO'S health and safety after instructing one or more members of the Defendant's nursing staff to continue to come into GWC-MILL BASIN, INC. and provide direct care to elderly residents, including JOSEPHINE DECICCO;

f. Intentionally, recklessly and/or repeatedly failed to frequently obtain vitals for all residents, including JOSEPHINE DECICCO, for signs/symptoms of a respiratory distress, fever, cough, all of which are known signs/symptoms of COVID-19;

g. Consciously disregarded the health of residents, including JOSEPHINE DECICCO, by failing to timely isolate residents suspected and/or symptomatic of COVID-19 from the general resident population;

h. Intentionally, recklessly and/or repeatedly failed to provide, maintain, monitor and/or employ standard contact and droplet precautions and PPE;

i. Intentionally, recklessly and/or repeatedly failed to ensure sufficient levels of staff to provide skilled health-related care and services and treatment to all residents, including JOSEPHINE DECICCO, in accordance with their care plans;

j. Intentionally, recklessly and/or repeatedly failed to ensure sufficient levels of staff to limit the nursing staff caring and/or assigned to positive or symptomatic residents from providing any care to negative or asymptomatic residents;

k. Intentionally, recklessly and/or repeatedly failed to provide positive or symptomatic patients with surgical masks and other protective interventions

to help reduce transmission;

l. Intentionally, recklessly and/or repeatedly failed to immediately isolate residents identified with symptoms of fever and lower respiratory illness, including, but not limited to cough, shortness of breath, and sore throat;

m. Intentionally, recklessly and/or repeatedly failed to maintain isolation protocols for residents identified with symptoms of fever and lower respiratory illness up to and until staff obtained a physician order that discontinued isolation protocol;

n. Intentionally, recklessly and/or repeatedly failed to provide all resident services, including, but not limited to meals, physical and occupational therapy, social service activities, and personal hygiene in residents' designated rooms with the door closed for both suspected and confirmed COVID-19 residents, and/or any resident displaying acute respiratory symptoms;

o. Intentionally, recklessly and/or repeatedly failed to disinfect frequently touched surfaces at a minimum of every two hours with EPA registered and approved products;

p. Intentionally, recklessly and/or repeatedly failed to adhere to, and/or have in place, cleaning and disinfection policies and procedures;

q. Intentionally, recklessly and/or repeatedly failed to purchase, provide, maintain, monitor and/or employ adequate PPE;

r. Intentionally, recklessly and/or repeatedly failed to limit access to the GWC-MILL BASIN, INC. facility to any and all individuals that were not essential employees and/or nursing staff personnel;

s. Intentionally, recklessly and/or repeatedly failed to ensure adequate levels of hand hygiene, hand washing, and/or alcohol-based hand disinfectant products/equipment;

t. Intentionally, recklessly and/or repeatedly failed to provide alcohol-based hand disinfectant/hygiene products both inside and outside of residents' rooms, including JOSEPHINE DECICCO's, at all entrances, and throughout any and all clinical areas;

u. Engaged in a pattern of conduct exhibiting an intentional and reckless disregard for JOSEPHINE DECICCO's health and safety by failing to provide appropriate and sufficient levels of nursing staff;

v. Engaged in a pattern of conduct exhibiting an intentional and reckless disregard for JOSEPHINE DECICCO' health and safety by failing to take appropriate action after residents, including JOSEPHINE DECICCO, displayed of symptoms of fever and lower respiratory illness, including, but not limited to cough, shortness of breath, and sore throat;

w. Engaged in a pattern of conduct exhibiting an intentional and reckless disregard for JOSEPHINE DECICCO's health and safety by accepting new admissions and/or re-admissions of residents that tested positive for COVID-19;

x. Engaged in a pattern of conduct exhibiting an intentional and reckless disregard for JOSEPHINE DECICCO's health and safety by cohorting suspected and/or positive COVID-19 residents with (at the time) non-

COVID-19 residents;

y.   Intentionally, recklessly and/or consciously disregarded the health of JOSEPHINE DECICCO by failing to communicate to her physician the need to test JOSEPHINE DECICCO for COVID-19 after JOSEPHINE DECICCO presented with COVID-19 symptoms, including, but not limited to, fever, cough, general but articulable malaise, and shortness of breath, intentionally, recklessly and/or repeatedly failed to test JOSEPHINE DECICCO for COVID-19;

z.   Intentionally, recklessly and/or repeatedly failed to maintain sufficient nursing staff to provide nursing and related services to attain or maintain JOSEPHINE DECICCO's highest practicable physical, mental, and psychosocial wellbeing as determined by JOSEPHINE DECICCO's assessments and individual plans of care;

aa. Intentionally, recklessly and/or repeatedly failed to operate and provide services in compliance with all applicable professional standards in ways including, but not limited to, maintaining adequate documentation in JOSEPHINE DECICCO's clinical record; and

bb. Intentionally, recklessly and/or repeatedly failed to promote care for residents in a manner and in an environment that maintains or enhances each resident's dignity and respect, including JOSEPHINE DECICCO, in full recognition of JOSEPHINE DECICCO's individuality.

200.    Prior to and at all times hereinafter mentioned, each of defendant's conduct, as outlined, hereinabove, was in reckless disregard.

201.    Prior to and at all times hereinafter mentioned, each of defendant's conduct, as outlined hereinabove, was willful.

202.    Prior to and at all times hereinafter mentioned, the actions of each defendant were willful and wanton acts, in total disregard of the plaintiff's decedent's well-being, thereby constituting gross negligence and/or thereby constituting willful and wanton acts.

203.    As a result of the foregoing, plaintiff is entitled to punitive damages pursuant to Public Health Law Section 2801-d(2) and common law, and costs.

204.    By reason of the foregoing, plaintiff Grace DeCicco, as Proposed Administrator of the Estate of JOSEPHINE DECICCO, has been damaged in an amount in excess of the jurisdictional limits of all lower courts in which this matter might otherwise have been brought.

 

**WHEREFORE**, plaintiff demands judgment against the defendant herein for such monetary relief, or other relief, as shall be called for by the proof and to be awarded by the Court and/or jury; the amount of damages sought herein exceeds the jurisdictional limits of all lower courts which might otherwise have jurisdiction herein; punitive damages pursuant to Public Health Law Section 2801-d(2); attorney's fees pursuant to Public Health Law Section 2801-d(6); and interest, together with the costs and disbursements of this action.

Dated: Melville, New York
      November 2, 2022

                        **LEITNER VARUGHESE WARYWODA PLLC**
                        *Attorneys for Plaintiff*

                        By: _____
                        **Justin Varughese, Esq.**
                        425 Broadhollow Road, Suite 417
                        Melville, New York 11747

## VERIFICATION

I, Justin Varughese, an attorney duly admitted to practice law before the Courts of the State of New York, affirm the following under penalties of perjury:

I am the attorney for the Plaintiffs in the above entitled-action.  I have read the foregoing **VERIFIED COMPLAINT** and know the contents thereof and, upon information and belief, after an inquiry reasonable under the circumstances, affirmant believes the matters alleged herein to be true and that the contentions herein are not frivolous.

The reason this verification is made by affirmant and not by Plaintiff is that the Plaintiff herein resides in a County other than the County in which I maintain my offices.

The source of affirmant's information and the grounds of his belief are communications, papers, reports, and investigations contained in the file maintained by this office.

Dated: Melville, New York
November 2, 2022

**LEITNER VARUGHESE WARYWODA PLLC**
*Attorneys for Plaintiff*

By: _____
**Justin Varughese, Esq.**
425 Broadhollow Road, Suite 417
Melville, New York 11747

Leitner Varughese Warywoda PLLC

Index No.

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF KINGS

The Estate of JOSEPHINE DECICCO, by her Proposed Administrator, GRACE DECICCO,

Plaintiff(s),

-against-

GWC-MILL BASIN, INC. and SUNRISE AT MILL BASIN,

Defendant(s).

## SUMMONS AND COMPLAINT

### Certification per 22NYCRR §130-1.1a

------------------------------------------------------------------

## Leitner Varughese Warywoda PLLC
### Attorneys for Plaintiff(s)
**425 Broadhollow Road, Suite 417**
**Melville, New York 11747**
**(631) 240-4390**

To:
Attorney(s) for

Service of a copy of the within                    is hereby admitted.

Dated:                          ...............................
                                Attorney(s) for

*PLEASE TAKE NOTICE*

NOTICE OF

ENTRY    that the within is a (certified) true copy of a          entered in the office of the Clerk of the within named
         Court on          20 .

NOTICE    that an Order of which the within is a true copy will be presented to the Hon.          , one of the
OF
SETTLEMENT    judges of the within named Court, at ,          , on          2022, at     M.

Dated:  November 3, 2022

Leitner Varughese Warywoda PLLC
*Attorneys for Plaintiff(s)*